_____ FILED        _____ ENTERED
_____ LODGED       _____ RECEIVED

SEP 25 2015   DJ

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                          DEPUTY

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* D R O'HARA and D R O'HARA, Individually,<br><br>Plaintiffs,<br><br>v.<br><br>THE BOEING COMPANY and INSITU, INC.,<br><br>Defendant. | **15 CV-01527**JCC<br>CIVIL ACTION NO. _____<br><br>**FILED IN CAMERA AND UNDER SEAL**<br><br>**PLAINTIFF's ORIGINAL COMPLAINT PURSUANT TO 31 U.S.C §§ 3729-32. FEDERAL FALSE CLAIMS ACT**<br><br>**JURY TRIAL DEMANDED**<br><br>**DO NOT PLACE IN PRESS BOX<br>DO NOT ENTER ON PACER** |

**COMPLAINT FOR VIOLATION OF**
**THE FALSE CLAIMS ACT – "QUI TAM"**

The United States of America, by and through *qui tam* Relator, D R O'Hara, brings this action under 31 U.S.C §§ 3729-32 (The "False Claims Act") to recover from the Boeing Company ("Boeing") and Insitu, Inc. ("Insitu") for all damages, penalties, and other remedies available under the False Claims Act on behalf of the United States and himself and would show unto the Court the following:

**ORIGINAL COMPLAINT**

1

Rhodes Legal Group, PLLC
918 South Horton Street, Suite 901
Seattle, Washington 98134
206-708-7852 | Fax 206-906-9230

## I.   INTRODUCTION

1.   This Complaint arises from the actions of the Defendants INSITU, INC., and THE BOEING COMPANY, to defraud the United States Government (USG) of millions of dollars related to its negotiation and performance of numerous contracts and subcontracts to provide unmanned aircraft systems (UAS), also known as "drones" to United States Navy/ Naval Air Systems Command (NAVAIR), Naval Air Weapons Station (NAWS) China Lake, and United States Military Group (USMILGP) Columbia, amongst others.  Through its pervasive applied deficient pricing and accounting methodology, by its submission of deficient pricing invoices to the Government, and by using non-contractually complying parts, the Defendants illegally realized millions of dollars in ill-gotten gains at the expense of the USG.

2.   Plaintiff/Relator D R O'Hara, ("O'Hara"), acting on behalf of and in the name of the United States of America, brings this civil action under the *qui tam* provisions of the False Claims Act and alleges as follows:

## II.   JURISDICTION AND VENUE

3.   This action arises under the False Claims Act, 31 U.S.C., § 3729, *et seq.*

4.   This Court has jurisdiction pursuant to 31 U.S.C. § 3732(a) and 3730(b). This court also has jurisdiction pursuant to 28 U.S.C §§ 1331 and 1345.  Venue is proper in this district under 28 U.S.C § 1391(b) and (c) because Boeing operates several major manufacturing facilities in King and Snohomish County in Western Washington.

5.   The facts and circumstances alleged in this Complaint have not been publicly disclosed in a criminal, civil, or administrative hearing nor in a congressional,

2

ORIGINAL COMPLAINT

Rhodes Legal Group, PLLC
918 South Horton Street, Suite 901
Seattle, Washington  98134
206-708-7852 | Fax 206-906-9230

administrative, or government accounting office report, hearing, audit, investigation, or in the news media.

6.     O'Hara is the "original sources" of the information upon which this Complaint is based, as that term is used in the False Claims Act.

### III.   PARTIES

7.     The real party in interest to the primary claims in this action is the United States of America.  The United States of America engages in business with the Defendants directly or indirectly through it procuring agencies and through its prime contractors who award subcontracts to Defendants.

8.     Relator, D R O'Hara, is an individual and citizen of the United States of America, currently residing in Hood River, Oregon.  He was employed by Boeing from 1973 until 2011 when he became a fulltime employee of Insitu, Inc as the Director Manager of Pricing, Estimating, and Procurement Financial Analysis (PE&P.) He was let go from Insitu in November 2014.  O'Hara has direct and independent knowledge of the facts asserted herein within the meaning of 31 U.S.C § 3730(e)(4)(B).  O'Hara obtained this knowledge through his employment with the Defendants.  He has voluntarily contacted and discussed his observations with the Government prior to the filing of this action.

9.     Defendant The Boeing Company is a Delaware corporation that regularly conducts business and has a several large manufacturing plants in King and Snohomish County in Washington State.  At all times material to the matters herein, Boeing was a supplier of goods and services, to include finished aircraft/drone and aircraft/drone components, to various departments of the United States, including, without limitation, the United States

3

ORIGINAL COMPLAINT

Rhodes Legal Group, PLLC
918 South Horton Street, Suite 901
Seattle, Washington  98134
206-708-7852 | Fax 206-906-9230

Navy. The term "aircraft" includes crafts commonly referred to as "drones."

10.     Defendant Insitu, Inc., is a wholly owned subsidiary of Boeing. It is headquartered in Bingen, Washington. Insitu is known for its design, development, production and operation of unmanned aircraft systems (UAS), also known as "drones." After its purchase of Insitu in 2008, Boeing implemented a practice of rotating the acting CEO and CFO every two years from Boeing fulltime employees.

11.     During the course of O'Hara's employment with Insitu, approximately 2000 proposals with an estimated value of USD $1.8B were produced by his department. Of that amount, approximately USD $1.4B were USG and Foreign Military Sale (FMS) contracts. Of the approximate USD $1.4B in proposals, approximately 80% ($1.14B) were Federal Acquisition Regulation Part 15 (FAR 15) proposals subject to Defense Federal Acquisition Regulation (DFAR), Truth in Negotiations Act (TINA) and required certification of cost or pricing data.

12.     In general terms, Insitu contracted with the USG and other foreign countries under three key models:

    a.   Customer/Government Owned – Customer/Government Operated solutions where Insitu only provided hardware and training to the customers/government personnel;

    b.   Customer/Government Owned – Insitu Operated solutions where Insitu sold the hardware, but conducted the operations via FTE or Contract Labor;

    c.   Insitu Owned, Insitu Operated – Where Insitu retained ownership of the hardware and also conducted the operation (commonly on a Time & Material or Cost-Per-Flight-Hour basis.)

4

ORIGINAL COMPLAINT

Rhodes Legal Group, PLLC
918 South Horton Street, Suite 901
Seattle, Washington 98134
206-708-7852 | Fax 206-906-9230

1

2

#### IV.   FACTUAL ALLEGATIONS

3

13.     In 2008, Boeing acquired Insitu. Insitu became a wholly owned subsidiary of Boeing

4

at that time.

5

14.     O'Hara, having worked for Boeing since 1973, volunteered as a Boeing consultant in

6

2009 to develop Insitu's first Federal Acquisition Regulation Part 15 (FAR 15) proposal

7

for a maritime UAS solution requested by the Department of Navy.  Bid was submitted

8

in mid 2009 and was awarded in August 2010.

9

15.     O'Hara was hired full time at Insitu in February 2011 as Director Manager of

10

Pricing, Estimating, and Procurement Financial Analysis (PE&P).

11

16.     As Director Manager of PE&P, his main duty was to develop the capacity to produce

12

new business proposals for government contracting and comply with FAR, DFAR, and

13

TINA

14

17.     Within the first month of employment with Insitu, O'Hara requested the hard

15

numbers/data from accounting to support the figures being submitted in bids and

16

proposals to USG.

17

18.     In O'Hara's previous work experience with Boeing, he had direct access to the

18

requested raw data and did not have to request it.

19

19.     O'Hara's initial requests were met with excuses along the lines of how it was not

20

possible at the time due to Insitu's deficient accounting systems but the company was

21

working towards being able to provide him with the requested data.

22

20.     Pursuant to FAR § 15.403-4 contracting officers are required to obtain "cost or

23

pricing data" before awarding a contract or subcontract exceeding $700,000 unless an

24

25

5

**ORIGINAL COMPLAINT**

exemption to submitting a cost or pricing data applies.

21.     The purpose of cost or pricing data is to ensure that contracting officers possess all

the information available to ensure the USG obtains fair and reasonable prices for the

goods and services it aquired.

22.     Insitu had been using an inventory-average-cost methodology to develop the

"mandatory" cost estimating relationship (CER) submitted to the USG.  This

methodology blurred current, accurate, and complete labor and material costs with used,

refurbished, reconditioned, reconfigured, surplus, and excess components, assembly,

installation, and test costs.

23.     In approximately March 2011, O'Hara observed contracts and proposals for new

equipment with USG agencies being executed using new, used, refurbished,

reconditioned, reconfigured, surplus, and excess inventory.

24.     On multiple occasions, O'Hara voiced his concern about the "deficiency" in the

accounting numbers and requested the raw data to correct them.

25.     As a direct result of Insitu's improper cost proposals, billing, and accounting

practices, the government paid Insitu and Boeing, millions of dollars more than it was

otherwise legitimately entitled to under its cost-plus type contracts and subcontracts with

the government, and its fixed-price incentive contracts that Insitu performed for the

USG.

26.     Over the course of his Insitu employment O'Hara refused to sign any (100+) cost

certifications due to his concerns about the accuracy of Insitu's cost methodology and

his inability to confirm the costs without the requested data.

27.     Insitu's CFO (Ira Schey, Randy Baltz) or the Contracts Director (Tina Sicilia)

**ORIGINAL COMPLAINT**

Rhodes Legal Group, PLLC
918 South Horton Street, Suite 901
Seattle, Washington  98134
206-708-7852 | Fax 206-906-9230

certified proposals.

28.     After Randy Baltz became CFO in 2012, Insitu's responses to O'Hara's requests for raw data shifted from not having the technological capabilities but "we are trying" to "why do you need the data?"

29.     Due to the continued denial of access to the data and a clearer understanding Insitu was not actually attempting to resolve any claimed technological impediments, in 2012 O'Hara began to develop a digital repository (data warehouse) to load and compile historical accounting and other business system costs and non-costs for use in pricing, estimating, and financial analysis.

30.     Additionally, O'Hara hired Sally Bailey (Bailey), a former Defense Contract Audit Agency auditor, as a Procurement Financial Analyst.  One of her key roles was to conduct an internal audit.  CFO Randy Baltz became aware of this task in September 2013.

31.     In approximately November 2013, Bailey informed O'Hara of her concerns upper management would intervene with her activities.  Her audit was close to completion and was supporting the conclusions and observations O'Hara had regarding Insitu's accounting deficiencies.

32.     On January 16, 2014, O'Hara requested in a public CFO staff meeting the raw data again.  O'Hara was promised by Randy Baltz, Josh Seitz, and Nikki Siddiqui the data at the meeting.

33.     Contrary to the promise and despite O'Hara's warnings and requests for raw data, Insitu chose to continue with its improper cost calculating, billing, and accounting practices.  Instead, on January 17, 2014, CFO Randy Baltz and Finance HR Dana

7

**ORIGINAL COMPLAINT**

Robison-Miller sent O'Hara a letter demoting him and relieving him of PE&P responsibility.

34.   Bailey was the first person discharged by O'Hara's immediate short-term replacement Kriss Fecht, thereby stopping the audit confirming the irregularities.

35.   The week after being demoted, O'Hara requested again from Senior Accountant Nikki Siddiqui the previously promised data as it still fell within the tasks of his newly demoted job's duties.  Siddiqui refused.

36.   A former subordinate of O'Hara, Andrew Clayton, was appointed as his permenant replacement.  Clayton had previously been passed over for promotion by O'Hara due to Clayton's involvement in an accounting error which resulted in approximately USD $2.5M in losses to Insitu.  One of Clayton's first acts in his new position was closing the data warehouse project, thereby removing a source of confirmation of costs and irregularities.

37.   O'Hara's work environment became increasingly hostile.  He was disciplined for using too much personal space on a publicly accessed Insitu computer and for the presence of inappropriate material on it. Finance HR Robison-Miller informed O'Hara the material was loaded externally and that he had never accessed it.

38.   In Fall 2014, Insitu refused to permit O'Hara to telecommute when a close family member becoming terminally ill.  The ability to telecommute was an option given to other employees regularly under non-emergency circumstances.

39.   In September 2014, O'Hara contacted the Boeing ethics hotline to voice his concerns about Insitu's accounting deficiencies and refusal to take corrective measures.

40.   In October 2014, Kriss Fecht recommended to O'Hara he should consider his

8

Rhodes Legal Group, PLLC
918 South Horton Street, Suite 901
Seattle, Washington  98134
206-708-7852 | Fax 206-906-9230

retirement options.

41.     In October 2014, O'Hara contacted Boeing again to check on the status of his ethics inquiry.  He was informed Insitu took over the investigation of their own improprieties.

42.     On November 19, 2014, newly appointed CFO Siddiqui conducted her first "Finance All-Hands" meeting. In her presentation, she indicated her intent to revert Insitu back to pre-Boeing accounting and fiduciary status.

43.     On November 20, 2014, O'Hara was let go from Insitu for failure to "meet expectations."

44.     As of August 2015, O'Hara remains unemployed. Despite being employed by Boeing since 1973, he has been informed that he is considered "toxic" by Boeing and is ineligible for rehire in any position of significance.

45.     Insitu's improper accounting and billing practices fell into four general categories as follows:

*(1)     Use Of Non-Conforming Parts*

46.     A large portion of Insitu's business model with the USG involved Insitu owning and operating the UAS and selling the service to the USG on a time & material or cost-per-flight-hour basis.

47.     The mission readiness rate (MRR) for the flight time was expected to be above 98%.

48.     An inability to operate a UAS when needed could result in the loss of human life.

49.     Insitu had to budget into USG proposals additional parts/materials necessary to maintain the required MRR at remote military locations.

50.     If a UAS broke down or certain parts were nearing the end of its expected lifespan,

**ORIGINAL COMPLAINT**

Rhodes Legal Group, PLLC
918 South Horton Street, Suite 901
Seattle, Washington 98134
206-708-7852 | Fax 206-906-9230

the extra parts were present on site to maintain mission readiness.

51.     The additional spare parts, equipment and materials were listed as new in proposals and priced as such.

52.     Instead of only using new parts, Insitu also used recycled, refurbished, reconditioned, reconfigured, and used parts.

53.     Insitu made millions of dollars through USG contracts being priced to use new parts and materials.

54.     A portion of those profits were improperly made due to having the USG pay the price of new parts and materials when they received cheaper and non-conforming used, recycled, refurbished, reconditioned, and reconfigured parts.

### (2)     *"Double Dipping" – The Reselling of Excess Parts*

55.     When a military location closed or a mission concluded, all UAS and equipment, including unused excess parts were removed and returned to Insitu.

56.     If those UAS and parts had been owned by the USG, they would be placed in a separate facility.

57.     However, in circumstances where the UAS was owned and operated by Insitu, all unused excess items were returned to Insitu's inventory of new parts.

58.     USG did not receive a rebate, credit, or future offset for the unused returned excess parts which had been priced as a part of the proposals.

59.     Insitu's inventory held no distinction between parts just manufactured and never exported versus recently returned unused items.

60.     Many of these former excess parts, listed as new and priced as such, were then

10

ORIGINAL COMPLAINT

Rhodes Legal Group, PLLC
918 South Horton Street, Suite 901
Seattle, Washington  98134
206-708-7852 | Fax 206-906-9230

included in other Insitu UAS owned and operated USG agreements or actually sold directly to the USG to maintain Government owned UAS.

61.     The proposals with USG were priced in accordance with the usage of brand new, never previously purchased parts.

62.     The actual cost to Insitu for the returned already-paid-for excess part was less than the cost of a part obtained from the original manufacturing source.

63.     Insitu made millions of dollars through USG contracts being priced to use new parts and materials, never previously sold.

64.     A portion of those profits were improperly made due to having the USG pay the price of new parts and materials listed at full cost when Insitu's actual real cost for the resold parts and equipment was less.

65.     USG paid more than they would have if Insitu accurately listed the costs of the parts being included in the proposals.

### (3)     "Manufactured" Cost

66.     Insitu produces different models of UAS. The strengths, weaknesses, capabilities, and manner of usage for each model vary. The model used will depend on the mission requirements.

67.     The aircraft system across all models is virtually the same. The models vary when it comes to the mission system.

68.     With aircraft systems being the same, one model of UAS can be converted to another model at a cost.

69.     The USG solicits bids for specific models for purchase or per-flight basis based on

11

ORIGINAL COMPLAINT

Rhodes Legal Group, PLLC
918 South Horton Street, Suite 901
Seattle, Washington  98134
206-708-7852 | Fax 206-906-9230

the mission requirements.

70.    In instances where Insitu had a lack of the desired models in inventory and a surplus

of unrequested models, Insitu would deconstruct the unwanted and reconstruct them into

the requested model.

71.    The converted model's cost was greater than the cost had Insitu simply built the

requested model.

72.    Instead of paying the lower first-time-built model rate, the USG paid the higher cost

Insitu manufactured through its conversion to alleviate its own inventory issues.

73.    Insitu made millions of dollars through USG contracts being priced at the costs of

converted models.

74.    A portion of those profits were improperly made due to having the USG pay a price

higher than the actual cost of a model purposely built to fulfil the order.

### (4) Failure to Pass "Bulk Buying" Savings

75.    Insitu purchases parts from suppliers to build their different models.

76.    In many instances, the cost-per-unit price for a part goes down as the quantity

purchased increases.

77.    When providing price quotes to USG, Insitu regularly bases USG quotes on the cost-

per-unit price of parts where the quantity ordered from a supplier was the amount

needed to fulfil the USG contract.

78.    Insitu then commonly orders larger quantities from suppliers and achieve a lower

than cost-per-unit than used in the USG contract quote.

79.    Insitu obtained a larger than quoted and revealed profit margin on the USG contract.

80.    Insitu made millions of dollars through USG contracts being priced based the higher

12

ORIGINAL COMPLAINT

1    than actual cost-per-unit.

2    81.    A portion of those profits were improperly made due to the USG paying a price

3    based on a higher than realized cost.

### V.    COUNT I – False or Fraudulent Claims: 31 U.S.C § 3729 (a)(1) (A)

82.    The allegations of the preceding paragraphs 1 through 81 are incorporated by reference and realleged as though fully set forth herein.

83.    On Information and belief, through Insitu's illegal practices and fraud, Insitu has knowingly presented or caused to be presented to the government a false or fraudulent claim, false record or statement for payment or approval.

84.    Because of the Defendants' acts, the United States sustained damages in an amount to be determine at trial and, therefore, is entitled to treble damages under the False Claims Act, plus penalties of no less than $5,500 and up to $11,000 for each violation.

### COUNT II – False Statements: 31 U.S.C § 3729 (a)(1) (B)

85.    The allegations of the proceeding paragraphs 1 through 84 are incorporated by reference and realleged as though fully set forth herein.

86.    On Information and belief, Insitu and Boeing knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim.

87.    Because of the Defendants' acts, the United States sustained damages in an amount to be determined at trial and, therefore, is entitled to treble damages under the False Claims Act, plus penalties of not less than $5,500 and up to $11,000 for each violation.

13

ORIGINAL COMPLAINT

Rhodes Legal Group, PLLC
918 South Horton Street, Suite 901
Seattle, Washington  98134
206-708-7852 | Fax 206-906-9230

## COUNT III - VIOLATIONS OF 31 U.S.C. § 3730(h)

88.     The allegations of the preceding paragraphs 1 through 87 are incorporated by reference and realleged as though fully set forth herein.

89.     Defendants, motivated by the lawful acts described above taken by the Relator in furtherance of this action, discriminated against the Relator regarding the terms and conditions of his employment.

90.     Defendants knew the Relator was investigating allegations of a sort which are routinely advanced in *qui tam* actions under the False Claims Act, and which could reasonably be expected, if left unresolved, to lead to such an action.

91.     Defendants' retaliatory employment actions have directly caused monetary damages and injuries to the Relator, as well emotional injuries.

92.     Defendants' actions constitute violations of the anti-retaliation provisions of the False Claims Act, 31 U.S.C. § 3730(h).

## PRAYER FOR RELIEF

WHEREFORE, Relator, on behalf of the United States and on his own behalf, demand judgment against defendant as follows:

A.     That this Court Order that Defendants cease and desist from violating 31 U.S.C § 3729

B.     That the Court enter judgment against the Defendants in an amount equal to three times the amount of damages the United States government sustained because of their actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, together with the costs of this action, including the cost to

14

**ORIGINAL COMPLAINT**

Rhodes Legal Group, PLLC
918 South Horton Street, Suite 901
Seattle, Washington  98134
206-708-7852 | Fax 206-906-9230

the United States government for its expenses related to this action.

C.     That the Relator be awarded all costs of this action, including attorneys' fees and expenses.

D.     That in the event that the USG intervenes in this action, the Relator be awarded an amount for bringing this action of at least fifteen percent (15%) and as much as twenty-five percent (25%) of the proceeds of the action or settlement of the claims;

E.     That in the event the USG does not intervene with this action, Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be not less than twenty-five percent (25%) nor more than thirty percent (30%) of the proceeds of the action or settlement.

F.     In relation to the 31 U.S.C. § 3730(h), reinstatement of his original retention rating, back pay with interest, compensatory and special damages, litigation costs, and attorney fees.

G.     That a trial by jury be held on all issues.

H.     That the USG and Relator receive any other relief, both at law and at equity, to which they may reasonably appear entitled.


Respectfully submitted,

Dated: _9/24/15_

Robert Rhodes, Bar #31089
Rhodes Legal Group, PLLC
918 South Horton St, Ste. 901
Seattle, WA 98134
(206) 708-7852
Robert@rhodeslegalgroup.com

15

**ORIGINAL COMPLAINT**

## DEMAND FOR JURY TRIAL

COME NOW Plaintiff-Relator D R O'Hara, through counsel, and acting on behalf of the United States of America and on his own behalf, hereby request a trial by jury on all issues of fact herein.


Respectfully submitted,


Dated: _9/24/15_

_[signature]_
Robert Rhodes, Bar #31089
Rhodes Legal Group, PLLC
918 South Horton St, Ste. 901
Seattle, WA 98134
(206) 708-7852
Robert@rhodeslegalgroup.com

16

**ORIGINAL COMPLAINT**

Rhodes Legal Group, PLLC
918 South Horton Street, Suite 901
Seattle, Washington  98134
206-708-7852 | Fax 206-906-9230

1

## **CERTIFICATE OF SERVICE**

2   I hereby certify that on August ___, 2015 I served the attached document by email and US Mail
on the following:

3

4   (Specifics will be needed)
United States Attorney's Office

5   Washington

6

US Department of Justice

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

17

**ORIGINAL COMPLAINT**

Rhodes Legal Group, PLLC
918 South Horton Street, Suite 901
Seattle, Washington  98134
206-708-7852 | Fax 206-906-9230